Filed 4/8/15  In re K.S. CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re K.S., a Person Coming Under the Juvenile Court Law. | |
| ORANGE COUNTY SOCIAL SERVICES AGENCY, | G051035 |
| Plaintiff and Respondent, | (Super. Ct. No. DP023489) |
| v. | O P I N I O N |
| C.S., | |
| Defendant and Appellant. | |

Appeal from an order of the Superior Court of Orange County, Gary Bischoff, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Kristen Lecong, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \*

## INTRODUCTION

The juvenile court found, pursuant to Welfare and Institutions Code section 366.26, that five-year-old K.S. was adoptable, and that none of the exceptions to termination of parental rights applied. (All further statutory references are to the Welfare and Institutions Code.) The court therefore terminated the parental rights of K.S.'s parents, C.S. (father) and A.C. (mother). Father appeals. Because substantial evidence supports the juvenile court's findings, we affirm the order.

## STATEMENT OF FACTS AND PROCEDURAL HISTORY

In January 2013, three-year-old K.S. was living with father, as well as father's parents and father's adult brother. Mother was living in Sacramento County with K.S.'s older sibling and younger half sibling. K.S. was developmentally delayed, and possibly mildly autistic. On January 25, 2013, K.S. got out of her home, chased her dog across a busy intersection, and ran to a nearby school. This was the third time she had gotten out of her home without an adult noticing or stopping her. A social worker with the Orange County Social Services Agency (SSA) investigated; SSA and father agreed to a safety plan, by which father would install a front door key lock by February 5, 2013, and would ensure that K.S. was supervised at all times.

On February 7, however, K.S. again got out of her home, ran across the busy intersection, and went to the same school. The social worker found that father had not yet installed the necessary lock on the door. Father claimed that his brother, who was supposed to be supervising K.S., had left without telling him. Father's speech appeared to be slow and unclear.

The social worker's investigation revealed 11 child abuse referrals involving K.S.'s family between 2004 and 2013, which raised claims of general neglect,

2

domestic violence, and drug abuse. Father had signed at least four safety plans with SSA since October 2010, and had received voluntary family services from SSA in October 2010.

K.S. was taken into protective custody. A juvenile dependency petition was filed, alleging K.S. came within the juvenile court's jurisdiction pursuant to section 300, subdivision (b). The petition alleged (1) K.S. was at risk of harm because father had failed to supervise her properly and had failed to follow through with the agreed-upon safety plan; (2) father had a history of substance abuse, mental health issues, domestic violence, and crime; (3) mother had a history of mental health issues, cognitive delays, substance abuse, and domestic violence; (4) mother had failed to maintain a relationship with K.S. for a year; and (5) mother had recently had two other children removed from her care under section 300, subdivision (b).[1] Following a detention hearing, the juvenile court ordered K.S. to be detained, and ordered that mother and father have two hours of monitored visitation twice a week.

Before the joint jurisdiction and disposition hearing, SSA reported that K.S. had adjusted well to her placement, and was regularly visiting with father and her paternal grandparents. Father had started participating in services, and was open and receptive to feedback. Father had no missed or positive drug tests.

SSA recommended that mother and father be provided with reunification services, but that K.S. not be returned to their custody: "The Court has for its consideration the safety and well being of the child . . . age 3 years old, who was brought to the attention of the Juvenile Court after the mother . . . and father . . . failed to protect the child, due to the father allowing the child to leave the home without proper supervision, and the mother living out of the area. It appears that the father and

---

[1] The day before K.S. was taken into protective custody, her sibling and half sibling were detained in Sacramento County because of domestic violence between mother and mother's boyfriend.

3

mother[ had] unresolved substance abuse problems and a history of domestic violence in front of the child. . . . [¶] . . . [¶] The father has been forthcoming and shows remorse for allowing the child to leave the house unattended on several different occasions, although continually making excuses for his lack of supervision of the child. It also appears that the father does not understand the significance of the potential consequences of allowing a developmentally delayed three year old child [to] escape the home to cross a very busy intersection unattended. [¶] It also appears that the father may have mental health or developmental concerns, as his processing and speech appear slow and at times confusing. In December 2011, the father's driver's license was suspended due to suspicious behavior[,] resulting in the need to show proof of a mental health evaluation before the license would be restored. However, the father has failed to follow through with this task. . . . [¶] The parents also have a significant history of domestic violence, including physical and verbal altercations in the presence of the child, resulting [in] the involvement of law enforcement. [¶] Through self-reports as well as police call logs, it appears that the parents have a history of substance abuse, including marijuana and methamphetamine[,] without showing proof of a substance abuse treatment program."

After the hearing, the juvenile court found the allegations in the dependency petition to be true, declared K.S. to be a dependent of the juvenile court, and placed her in foster care. The court approved the case plan and visitation plan.

In the six-month status review report, the social worker reported that father's compliance with the case plan was moderate. Father regularly attended and was cooperative at individual counseling sessions. He had no missed or positive drug tests through August 2013, but tested positive for amphetamine and methamphetamine in September. Father regularly visited with K.S., although he was described as having only "marginal parenting skills." After K.S. was placed with a foster family, father missed several visits. K.S. asked for father, and got upset when he missed or cancelled visits.

4

In the 12-month status review report, it was noted that father had been authorized to have six hours of monitored visitation per week. Father's compliance with the case plan was again reported to be moderate. Father had no missed or positive drug tests. He completed the required parenting class and outpatient drug treatment program. Father did not use all of his allotted visitation time and cancelled some visits. He did not accept an offer to make up visits when K.S. went out of town with her foster parents. K.S.'s behavior was worse after visits with father, and she had tantrums and did not want to see him. Father requested a paternity test to be sure he was K.S.'s biological father. SSA reported that mother had not participated in any services, had tested positive for methamphetamine, and was incarcerated in November 2013 for domestic violence and drug possession. Mother's reunification services were terminated, and father was given a further six months of services.

During the 18-month review period, the paternal grandfather died. Father stopped visiting K.S. and stopped participating in reunification services. Father missed multiple drug tests. He also missed the annual review for K.S.'s individualized education plan.

SSA reported that K.S. was in a safe, stable, and loving foster home, and she was able to walk, run, jump, draw, and communicate. She was making progress in preschool. At the conclusion of the 18-month review hearing, the court terminated father's reunification services, and set the matter for a hearing under section 366.26 to select a permanent plan for K.S.

In the permanency hearing report, SSA advised the court that father had resumed visitation with K.S., but had missed many drug tests, and had tested positive for methamphetamines.

K.S. was by that time five years old, and was an active, energetic child who could walk, run, swim, and ride a bicycle with training wheels, and was toilet trained. She was observed to be happy, comfortable, and content in her environment. K.S.'s

5

foster parents had expressed interest in adopting her, and wanted her to have contact with her sibling and half sibling who were residing with prospective adoptive parents in Sacramento.

At the end of the hearing, the court found by clear and convincing evidence that K.S. was adoptable, and terminated mother's and father's parental rights. The court also found that none of the exceptions to adoption applied. As is relevant to the issues presented by this appeal, the court made the following findings on the record: "I find that termination of parental rights would not be detrimental to the child and that, in fact, the child's interests will be promoted by this termination. . . . [¶] . . . [¶] And the exception that's been, at least, identified by father's counsel is what is known as the parental benefit exception. That exception requires that the parents carry the burden to show that they have engaged in regular and consistent visitation with the child as the first prong, and as the second, that they have to also show that the relationship that exists between that parent and the child is so beneficial that to terminate that relationship would be detrimental to the child or cause great harm to the child. [¶] That evidence has not been forthcoming. The court has no evidence to support a finding that there has been regular and consistent visitation, nor is there evidence that suggests that . . . the relationship that exists between the parents and the child is such that it would outweigh the benefit that the child would have for a permanent and stable home through adoption. [¶] I fully understand the comments made by the paternal grandmother and I sympathize with the situation that this family finds itself in and it's truly tragic when the court has to terminate parental rights between children and parents that truly love each other and I accept your representation that that's true. [¶] . . . [¶] . . . But K[.S.] cannot wait for her parents to be ready to parent her and because of that, the statutes that the Legislature has directed that we have to, at these hearings, determine a permanent plan, and so the court is required by law to terminate parental rights at this stage with the evidence that I have before me."

6

The court therefore ordered adoption as K.S.'s permanent plan. Father filed a timely notice of appeal. Mother did not appeal.

The sole issue father raises on appeal is whether the juvenile court erred in concluding that the section 366.26, subdivision (c)(1)(B)(i) exception to termination of parental rights did not apply. Section 366.26, subdivision (c)(1)(B)(i) allows the juvenile court to decline to terminate parental rights over an adoptable child if it finds "a compelling reason for determining that termination would be detrimental to the child" because "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." Father has the burden of proving both prongs of the parent-child relationship exception were satisfied. (*In re L. Y. L.* (2002) 101 Cal.App.4th 942, 949.) We consider whether substantial evidence supported the juvenile court's determination the parent-child relationship exception did not apply. (*In re Cliffton B.* (2000) 81 Cal.App.4th 415, 424-425.)

The juvenile court's finding that father had not maintained regular and consistent visitation is supported by substantial evidence. Father had no visitation with K.S. for four months during the dependency period. During other periods when father was visiting with K.S., he often missed visits, did not take advantage of opportunities to make up missed visits, ended visits early, or failed to interact with K.S. during the visits.

Even if we were to accept father's contention that substantial evidence did not support the juvenile court's finding as to visitation, we would conclude that it did support the court's finding that K.S. would not benefit from maintaining the parent-child relationship with father.

In *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575-576, the court stated: "In the context of the dependency scheme prescribed by the Legislature, we interpret the 'benefit from continuing the [parent/child] relationship' exception to mean the

7

relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated. [¶] Interaction between natural parent and child will always confer some incidental benefit to the child. The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation. [Citation.] The relationship arises from day-to-day interaction, companionship and shared experiences. [Citation.] The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent. [¶] At the time the court makes its determination, the parent and child have been in the dependency process for 12 months or longer, during which time the nature and extent of the particular relationship should be apparent. Social workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court. The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond. The age of the child, the portion of the child's life spent in the parent's custody, the 'positive' or 'negative' effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond."

We recognize, as did the juvenile court, that father and K.S. love each other, had a bond, and K.S. enjoyed her visits with father. However, under well-settled law, these facts are not enough to establish the application of the parent-child relationship exception to adoption. (*In re C.F.* (2011) 193 Cal.App.4th 549, 558-559 [a parent "may

8

[not] establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact"].)  In *In re Helen W.* (2007) 150 Cal.App.4th 71, 81, a panel of this court held that the parent-child relationship exception did not apply, although the children referred to the mother as "'Mom,'" the mother and the children loved each other, and the mother provided for the children's needs during visits.  Similarly, in *In re Cliffton B.*, *supra*, 81 Cal.App.4th at page 424, the father had "maintained a significant relationship with" his child, despite "the artificial restraints created by monitored weekly visitation."  The juvenile court, however, was nevertheless required to "engage in a balancing test, juxtaposing the quality of the relationship and the detriment involved in terminating it against the potential benefit of an adoptive family."  (*Id.* at pp. 424-425.)

Father cannot show that K.S. would suffer any detriment if her relationship with him were severed.  In order to apply the parent-child benefit exception to adoption, the parent must demonstrate "the benefits to the child of continuing the parental relationship outweigh the benefits of permanence through adoption."  (*In re J.C.* (2014) 226 Cal.App.4th 503, 533.)  Despite having received 18 months of reunification services, including counseling, substance abuse treatment, and a parenting class, father completely ignored K.S. for four full months,[2] tested positive for drugs, and failed to advance beyond six hours of monitored visitation with K.S. per week.  K.S.'s foster parents, by contrast, provided consistent care and support, and it was undisputed that K.S. was thriving in their care.

No bonding study was offered in evidence.  Father did not provide any testimony at the section 366.26 hearing.[3]  K.S. was only five years old at the time of the

_____

[2]  We recognize that father was mourning the loss of his own father's death during this time period.  However, no child, especially one with special needs, can wait around for a parent for four months.

[3]  The record reflects that father was present before the hearing started, but left without any notice before the proceedings began that day.

9

section 366.26 hearing. She had lived with father for the first three and a half years of her life, but had lived with the prospective adoptive parents for over a year at the time of the section 366.26 hearing. K.S. did not have any particularly positive or negative interactions with father during the dependency period. K.S. did have special needs, due to her developmental delays, possible autism, and medical problems that father did not seem to be able to handle well. Father missed K.S.'s individualized education plan meeting. He failed to check in with the foster parents the day K.S. underwent a tonsillectomy. And father did not consent to K.S. receiving a flu shot because he was concerned there was mercury in the vaccine. The evidence supported the juvenile court's finding that K.S. would not suffer any detriment if father's parental rights were terminated.

DISPOSITION

The order is affirmed.

FYBEL, J.

WE CONCUR:

O'LEARY, P. J.

RYLAARSDAM, J.

10